STATE, RESPONDENT, *v.* NORTHERN PACIFIC RAILWAY CO., APPELLANT.

(No. 2,887.)

(Submitted September 13, 1910.   Decided October 3, 1910.)

[111 Pac. 141.]

*Criminal Law—Railroads—Trainmen—Hours of Labor—Violation of Statute—Circumstantial Evidence—Quantum of Proof —Presumptions—Instructions—Law of the Case—Jury must Obey.*

Criminal Law—Railroads—Trainmen—Hours of Labor—Violation of Statute—Evidence—Insufficiency.
  1.   Evidence *held* insufficient to support a verdict finding the defendant railway company guilty of a violation of the provisions of sections 1741 and 1742, Revised Codes, prohibiting railroads from requiring their trainmen to work for more than sixteen consecutive hours.

Same—Circumstantial Evidence—*Quantum* of Proof.
  2.   Where circumstantial evidence is relied upon to convict of crime, the circumstances must be not only consistent with defendant's guilt, but inconsistent with any other reasonable hypothesis.

Same—Conviction—When Evidence Insufficient.
  3.   To sustain a conviction in a criminal prosecution, there must be some substantive testimony.   Mere suspicions or probabilities, however strong, are insufficient.

Same—Presumptions—Innocence of Accused.
    4.  Every presumption is in favor of the innocence of one accused of crime.

Same—Instructions—Law of the Case—Jury must Obey.
    5.  The court's instructions to the jury are the law of the case, and a verdict in conflict therewith will, on appeal, be set aside as against law.

*Appeal from District Court, Yellowstone County; Sydney Sanner, Judge.*

THE NORTHERN PACIFIC RAILWAY COMPANY was convicted of requiring one of its trainmen to work for more than sixteen consecutive hours, and appeals from the judgment and an order denying it a new trial.    Reversed and remanded.

There was a brief in behalf of Appellant, by *Mr. Wm. Wallace, Jr., Mr. J. G. Brown,* and *Mr. R. F. Gaines,* and oral argument by *Mr. Wallace.*

*Mr. W. L. Murphy,* Assistant Attorney General, argued the cause orally in behalf of the State.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

The Northern Pacific Railway Company was convicted of violating the provisions of sections 1741 and 1742, Revised Codes, and has appealed from the judgment and from an order denying it a new trial.

On October 9 and 10, 1909, A. P. Johnson was employed by the defendant company as a train conductor in charge of and operating an extra train, No. 109, which train was working wholly within this state and handling only local or intrastate business.  The information charges that the defendant railway company did willfully, intentionally, and unlawfully order and require Johnson to labor as conductor of said train for more than sixteen consecutive hours, to-wit, from 5 P. M., on October 9, to 12:25 P. M. of October 10, and that, pursuant to said order and direction, Johnson did so work for that length of time. Some of the facts were agreed upon by counsel for the state and the railroad company, and are embodied in a written stipulation,

while the other facts were given by witnesses at the trial; but
there is not any conflict whatever in the evidence, and, so far as
this appeal is concerned, it may be treated as though all the facts
had been agreed upon and submitted to the jury. Some of those
facts are unimportant in the details, and will be stated generally.
Train 109 was known as a "sugar beet train." Its business was
to distribute empty freight-cars in the beet-growing territory,
and pick up cars loaded with beets and take them to the sugar
factory at Billings. Johnson and the other members of the train
crew were called at Billings, where the train originated, for 5
P. M. on October 9. The train did not leave the Billings yards,
however, until 6:15. It proceeded to Laurel, making a stop at
Yegen. It arrived at Laurel at 8:16 P. M., and, while still there,
and at about 9:20 P. M., Johnson received an order to work his
train until 6 A. M. of October 10 between Laurel, Boyd, and
Bridger. Pursuant to this order, Johnson took his train to
Silesia; thence over the Clark's Fork branch to Bridger, where
he arrived at 12:01 October 10, and, completing his work over
that branch, returned to Silesia at 3 A. M., where he received an
order at 3:40 A. M. to work between Silesia and Boyd until 8
A. M. Pursuant to this order, Johnson worked his train to Boyd
and back as far as Joliet, where at 7:40 A. M. he received train
order No. 223, as follows: "Engine 109 will run extra Joliet to
Laurel, meet extra 401 west at Silesia." October 10, 1909, was
Sunday. The telegraph operator at Joliet was not required to
be on duty on Sunday except to meet passenger trains. While
the evidence is meager, it appears that upon receipt of order 223
above Johnson ran his train by the depot at Joliet, and the oper-
ator there reported to the dispatcher that 109 left Joliet at 7:53
A. M. After making this report, the Joliet operator apparently
went off duty at once. From Joliet to Laurel is 17.6 miles; from
Joliet to Silesia, eight miles. The report which the Joliet oper-
ator made to the dispatcher was erroneous. Instead of proceed-
ing to Silesia, Johnson moved his train to the east switch at
Joliet, then backed it on the siding there and remained until 9:25
A. M., when he proceeded to Silesia, where he arrived at 10 A. M.,
and in taking the siding there the bottom of one car of his train

gave way, precipitating a load of beets on the track. Johnson
went to the office of the operator at Silesia to report this accident
to the division superintendent, and, while in the office making his
report, he received from the dispatcher an order tying up his
train, and relieving the crew from further work at that time. In
order to get his train off the main track, Johnson secured the ser-
vices of sectionmen, removed the sugar beets from the track, then
put his train on the siding, and at 12:25 P. M. he and the re-
mainder of the crew went off duty.

At the close of the evidence, counsel for the defendant railway
company moved the court to direct a verdict in favor of defend-
ant, on the ground that the evidence is insufficient to justify a
verdict of guilty. The motion was denied. One ground of the
motion for a new trial is: "The verdict is contrary to law." Of
the errors specified by counsel for appellant, it will be necessary
to consider only those arising from the order of the court refus-
ing to direct a verdict, and its refusal to grant a new trial upon
the ground specified above.

In order to make out a case, it was incumbent upon the state
to prove beyond a reasonable doubt that the railway company
ordered or required Johnson to labor more than sixteen consecu-
tive hours. Whether the phrase "be on duty," as used in section
1741 above, was intended by the legislature as synonymous with
the word "work," we need not now stop to consider. Counting
from 5 P. M. of October 9, the time when Johnson reported for
duty, the period of sixteen consecutive hours during which he
might lawfully labor under orders or directions from the railway
company would expire at 9 A. M. October 10. So far as this
record discloses, the only orders or directions which Johnson had
or received were those from the dispatcher referred to above, and,
for the purposes of this case, the dispatcher was the railway com-
pany. Briefly reviewed, those orders are: (1) Go from Billings
to Yegen; (2) go from Yegen to Great Northern Junction; (3)
proceed to Laurel; (4) work between Laurel, Boyd, and Bridger
until 6 A. M. October 10; (5) work between Silesia and Boyd
until 8 A. M. October 10; (6) run from Joliet to Laurel. There

is not any time limit in any one of the first three orders above. But in view of the fact that they were delivered to Johnson soon after he went on duty, and that he made the run from Billings to Laurel in three hours and six minutes, including stops, and that the distance is only 18.6 miles, there cannot be any inference drawn from any, or all three, of those orders that the railway company ordered or directed or intended Johnson to work for more than sixteen hours in getting from Billings to Laurel. The fourth order above was given at 9:17 P. M. October 9, and it not only does not direct Johnson to work beyond 9 A. M. of October 10, but specifically limits the time for his work to 6 A. M. The fifth order was given at Silesia at 3:40 A. M., and it likewise specifically limits the time of work in this instance to 8 A. M. So that it is impossible to draw any inference of guilt from either or both of these two orders. The only other order or direction given to Johnson is contained in train order 223, quoted above, which was delivered to him at 7:40 A. M. on October 10 at Joliet. And if any inference of guilt whatever is to be deduced from the evidence, taken as a whole, it must be found in this order 223, considered in the light of surrounding circumstances. Order 223 merely directs Johnson to proceed from Joliet to Silesia, meet train 401, and then proceed to Laurel. There is not any time limit mentioned within which this work should be done. The running time between Joliet and Laurel is not given in the evidence. The distance from Joliet to Silesia is eight miles, and the running time forty minutes. The distance from Silesia to Laurel is 9.6 miles. At 7:40 A. M. on October 10, when Johnson received order 223, he had one hour and twenty minutes to run from Joliet to Silesia, meet train 401, and get to Laurel by 9 o'clock, the time when his sixteen consecutive hours of labor would expire, counting directly from 5 P. M. of October 9. Whether or not this period of one hour and twenty minutes was sufficient within which to do what Johnson was so ordered to do, whether or not train 401 would be at Silesia by the time 109 would reach there in the ordinary course of its running, or, if not, for what length of time train 109 would have to wait at

41 Mont.—36

Silesia—are all matters upon which the record is absolutely silent.

Since order 223 does not of itself furnish evidence of a criminal intent on the part of the railway company, and there is not any other direct evidence, the state was forced to rely upon circumstantial evidence to show such willful purpose or criminal intent. Can it be said, then, that in issuing order 223 the railway company knew that Johnson could not do the work required by the order to be done, and complete it by 9 o'clock A. M., or that such order was given with a reckless disregard as to whether or not it would require Johnson to remain at work beyond that hour? We are at a loss to know how either inference can be drawn from the evidence to which reference has been made, and to spell out either inference can only be done, if at all, by marshaling all the presumptions arising from the evidence, in favor of defendant's guilt. When a corporation is charged with a violation of a penal statute, it occupies precisely the same situation that a natural person does. It is presumed innocent until proven guilty. The state must establish its guilt by evidence showing such fact beyond a reasonable doubt; and, where circumstantial evidence is relied upon to establish guilt, the circumstances must be not only consistent with the idea of defendant's guilt, but inconsistent with any other reasonable hypothesis. Such is the rule in this state, and generally recognized as correct. (*State* v. *Allen*, 34 Mont. 403, 87 Pac. 177.) From the fact that after receiving order 223, and before any countermanding order was given him, Johnson did actually work until after 9 A. M. of October 10, there might appear at first blush some inference of guilt on the part of the railway company, if the circumstances stood alone and unexplained. However, there are some additional facts disclosed by the record which bear upon this subject. At the time (7:40 A. M. October 10) when Johnson received order 223 to proceed from Joliet to Laurel, meeting train 401 at Silesia, he had one hour and twenty minutes remaining of his sixteen hours of labor. He had less than eighteen miles to run with thirty-four loads, and his train was then ready to start, so

far as we know from the record.  He actually pulled his train by the depot at Joliet, and the operator there, apparently believing he was starting on his journey pursuant to order 223, reported to the dispatcher that he had actually left Joliet with his train at 7:53 A. M.  This report was entered on the train-sheet in the dispatcher's office.  Instead, however, of continuing his journey to Silesia, as ordered, Johnson backed his train on the siding at Joliet and waited for one hour and thirty-five minutes, and the only explanation found in the record for his doing so is his statement that he was waiting for train 29, a train not mentioned in the order, and the arriving time of which at Joliet is not given.  At 8 A. M. the dispatcher who gave order 223 and received the report from the Joliet operator and made the entry on the train-sheet went off duty, and a new dispatcher assumed his place.  The new dispatcher, finding that Johnson's train was reported out of Joliet at 7:53, assumed that it would reach Silesia at 8:33, forty minutes being its running time.  As the train did not appear at Silesia on time, and as the dispatcher was not able to get the operator at Joliet from 8 A. M. until 10 A. M., he did not know, and was apparently unable to ascertain, where Johnson and his train were during that period, or until Johnson finally arrived at Silesia and reported the accident to his train at that place, when he was immediately relieved.  Whether Johnson's reason for holding his train at Joliet was a valid one or not does not appear, and it does not concern us; but by what process of reasoning it can be said that the order to him to proceed from Joliet to Silesia, given at 7:40 A. M., authorized or directed him to wait one hour and thirty-five minutes at Joliet and then proceed, we are unable to understand or appreciate.  It cannot be said that there is a presumption that the railway company intended to violate the law.  Every presumption is in favor of the innocence of anyone accused of crime.  So far as we know from the evidence, there was ample time for Johnson to make the run from Joliet to Laurel after he received order 223 and before 9 A. M.  The distance was but 17.6 miles, and he had one hour and twenty minutes within which to make the run.  At least, it

must be considered a fair presumption that the time was ample for him to run from Joliet to Silesia, a distance of only eight miles, where his train could have been tied up and he relieved from further duty if it then became apparent that he could not complete the run to Laurel before the expiration of his sixteen hours of continuous labor. It does appear affirmatively that the railway company did not have any opportunity to control his movements after 8 A. M. and before 10 A. M., and, in order to convict the defendant, the prosecution must show that in working after 9 o'clock on October 10 Johnson did so, not voluntarily, but by order or direction of the railway company, and in this, we think, it has failed entirely.

The state has not furnished any brief in this case; but we have searched the record, and have been unable to find any evidence indicative of guilt. In *State* v. *McCarthy*, 36 Mont. 226, 92 Pac. 521, this court said: "There must be some substantive testimony to justify the judgment of a court. Mere suspicions or probabilities, however strong, are not sufficient basis for a conviction of crime." This was approved in *State* v. *Duncan*, 40 Mont. 531, 107 Pac. 510.

2. The court gave instruction No. 5b, as follows: "It is alleged in the information in this case that the defendant railway ordered A. P. Johnson to work and labor for more than sixteen *consecutive* hours. It is not enough that the proof should show beyond a reasonable doubt that said A. P. Johnson did so in fact labor, but it must appear beyond a reasonable doubt that the orders given him by the defendant railway company required him to so work and be on duty for the full period as charged in the information, and, if this is not proven, your verdict must be for the defendant." This instruction became the law of the case, binding upon the jury, and a verdict in conflict with it will be set aside as against law. (*Murray* v. *Heinze*, 17 Mont. 353, 42 Pac. 1057.) When we consider the evidence as a whole, it seems impossible that the jury could have reached the verdict which was returned, except upon the theory that the railway company was responsible for any work which Johnson did after 9 A. M. of October 10, whether it ordered or directed such

work or not, a theory directly conflicting with the instruction quoted above.

The judgment and order of the district court are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. Chief Justice Brantly and Mr. Justice Smith concur.